REED v. WESSEL.

## Lucien Reed and Another v. Samuel B. Wessel and Others.

An objection to a misjoinder of complainants in chancery, made for the first time at the hearing, will not be allowed where the court can make a decree which will do entire justice between the parties.

Accordingly where one of two complainants sought to have certain judgments against him decreed satisfied, and the other to have sales made under said judgments declared fraudulent and void, and the relief sought by each depended upon the same state of facts, and the decree, if relief was due to either, would dispose of the whole equities without confusion, — *Held*, that the objection of misjoinder, taken for the time first at the hearing, should be disallowed.

Where one of two copartners sold out his interest in the copartnership assets to the other, taking back an agreement that the purchaser would pay the partnership debts, and the latter, instead of paying them, caused them to be bought up in the name of a confederate, and judgments to be obtained thereon, on which the lands of the other co-partner were sold to such confederate, — *Held*, that these sales should be set aside as fraudulent and void on behalf of one to whom the owner had conveyed the lands, and that it was not necessary for the complainant to show that he had purchased and paid a valuable consideration for the lands.

*Heard July* 11th *and* 12th. *Decided October* 11th.

Appeal by defendant Wessel from the Ingham Circuit in Chancery, where decree was made as prayed in the bill. The evidence in the case was voluminous, but that, together with the pleadings, is sufficiently stated in the opinion for an understanding of the legal questions.

*A. Blair* and *O. M. Barnes*, for complainants.

*Johnson & Higby* and *J. W. & E. Longyear*, for defendants.

CAMPBELL J.:

This bill is filed to have certain judgments declared satisfied, and their lien set aside upon property sold under them. Lucien Reed being a partner with John C. Granger, dissolved his connection with him by selling out and taking back a bond that Granger would pay the debts. Attachments were levied and judgments obtained, and sales had

upon land of Demis Reed which she obtained from Lucien. The bill seeks to avoid these sales and cancel the judgments on the ground that they were actually obtained by the fraudulent collusion of Granger, Atwood, and Wessel, and that Granger really owned them, and resorted to the aid of the other parties to keep them alive when they should have been cancelled. The facts will be more fully alluded to in a subsequent part of the opinion.

Wessel only appeals from the decree below, which was in favor of complainants.

It is first objected that the bill is fatally defective, because the complainants are misjoined. This objection was not taken until the hearing. But there may be cases in which such an objection, if well founded, would prevail although not taken sooner. Such cases, however, are not common, for if the court can make a decree which will do entire justice among the parties, the objection, if not taken before the hearing, will not generally be allowed to prevail.— *Story Eq. Pl.* § 237.

The case made by the bill, if sustained, would furnish a ground for equitable relief to each complainant. The relief would, as the case is presented, depend upon the same facts. Demis Reed does not claim relief on the ground that she is a *bona fide* purchaser, as against real creditors. The decree, if any relief is due to either, may, and does, dispose of the whole equities without confusion. The same equity which would entitle Lucien Reed to have the judgments discharged because alleged to have been purchased in fact for Granger, who was bound to pay them, would equally entitle Demis Reed to hold her title free from them because they were invalid against her grantor.

Without deciding what force the objection taken would have had if made at an earlier stage of the suit, it is not of such a fatal character as to avail at the hearing.

It becomes necessary, therefore, to examine into the merits of the case.

It appears from the evidence that Reed & Granger dissolved partnership, November 2d, 1855, Granger continuing the business, and agreeing to pay the partnership debts, and some individual debts of Reed connected with the business. On the 26th of the same month Granger absconded, having on the same night placed all or most of the store property in the hands of Wessel, who claims to have purchased at that time; and was absent about two weeks. On the 29th of November, 1855, Churchill, Walkley & Johnson sued out an attachment against Reed & Granger, for $325, which was levied on the land now claimed by Demis Reed, and upon the personal property in the hands of Wessel. This was followed up by other attachments, in December, 1855, and January, 1856. In the same winter and ensuing spring the control of all the joint claims against Reed & Granger came into the hands of Atwood. Before judgment was rendered the goods and personal property were discharged from the levies. In September, 1856, a sale was had under two of the judgments, which were against Reed alone, and the real estate was struck off to Wessel for $325. No money was paid to the sheriff on this sale. The matter was settled by Wessel giving a note to the Messrs. Longyear, plaintiff's attorneys, but it does not appear for what sum, or for whose benefit. The sheriff's costs were paid by the attorneys. In the ensuing month of October the land was struck off on the remaining judgments, which were against Reed & Granger, for $925, to Atwood, who already controlled the judgments, and had become possessed of the claims before put in judgment. One of these judgments was in the name of parties in whose favor one of the judgments was rendered against Reed. Wessel obtained an assignment from Atwood after the bill was filed, and after service of subpœna.

The foundation of claim to equitable relief here is based upon the theory that, at the time of Granger's absconding, Atwood and Wessel were confederated with him to dispose of his property in such a way as to defraud Reed, by leaving, or

causing the debts which Granger was bound to pay, to be collected out of Reed, and that the property was so managed. It is claimed that when the sales were made on these judgments, they were not enforced on behalf of the original creditors, but to carry out this fraudulent plan; and that Granger and his confederates had obtained control of them by means of the property of Granger, which had been vested in him by the agreement with Reed when the partnership was dissolved.

The fraud of Granger in disposing of his property is very clearly made out. But it is claimed that Wessel is not affected by that fraud, and is in the position of a *bona fide* purchaser of the personal property, and of the land; and that Atwood was also an innocent purchaser.

The witnesses Wilson, Hendrix, and Binding, all testify to Granger's statements beforehand, of his intention to defraud Reed by the assistance of his friends. Hendrix and Binding refer to Wessel by name. These statements alone would not, however, be evidence against Wessel. Howard testifies to a conversation with Wessel himself, wherein he expressed the same intention which the other witnesses declare that Granger informed them of. The effect and weight of this evidence of declarations must depend very much on the degree of corroboration it receives from other circumstances.

On the 26th of November, 1855, late in the evening, Granger, accompanied by Atwood, and by George J. Sly, (who was subsequently connected with the business) went to Wessel's house, with an inventory of goods in store, and of notes and accounts. The case does not show when or how the bargain was made with Wessel, unless made on that night. The complainant's witness, Dunning, who testifies as to the fact of the arrangement going on, was not present in the room where the details were agreed upon, and the defendants' witness, Sly, is the only one not a party who was there. It appears from his statements, if true, that there was an inventory, and that the transaction em-

braced the goods, accounts, notes, and the store itself. It is not credible that this arrangement could have been made without some previous understanding, or that Granger would have made out an inventory, and taken up that, with the books and notes, without some assurance that his arrangement would succeed. It appears from Dunning's testimony, that Granger, earlier in the day, had urgently desired the latter to purchase his carriage, and at the same time expressed his design to dispose of everything. His preparations were all made for departure. The inference is irresistible that Mr. Wessel was not a stranger to Granger's projects, and that the declarations testified to are to be believed. The assignment is not given in evidence, and as the proof of a *bona fide* purchase was incumbent on Wessel, upon the case made, the absence of this instrument is unaccountable, and must be regarded with suspicion. Even if a purchase were fully proved, the circumstances are enough to affect it with frand, as against Reed and the other creditors. But the subsequent transactions are such as to corroborate the idea that this pretended sale was a mere delusion. The business, after Granger's return, was carried on with his assistance, not only while the name of Wessel was used, but up to the time when the testimony was taken, with perhaps some short absences. The defendants' witnesses Aaron Wessel and Sly, state that he was to receive a dollar a day for his services as clerk and salesman. But it appears that the old accounts were settled by Granger in his own name, and he used the goods in the store in paying for his own matters, to an extent which would more than absorb his wages.

The claims which were assigned to Atwood, so far as any evidence touches them, were paid for by Granger. Atwood was very clearly acting merely as Granger's assistant, and from the whole case it is plain that they were taken in his name to defraud Reed. The defendants have not shown the consideration of any of these purchases, nor

when, nor by whom, they were made. But the complainants show, in all the Michigan claims, that Granger was the real party, and that the debts were paid for at their face—a thing which no speculating purchaser would do. The testimony shows, and it is not denied, that Atwood had all the partnership claims before judgment, and if he bought and paid for them as claimed, he could easily have shown it. Among these was the debt on which the property was first attached, and which, if valid, would be first in order. Wessel does not show when or how he arranged his purchases, nor with whom he dealt as owners of them. As one of those claims was held by Warner & Loop, who owned one of the debts purchased by Atwood, it is not presumable that they could have disposed of one without the other, when their remedy depended on the same levy. Neither can we account for the discharge of the personal property from all of the attachments, unless Wessel and Atwood were jointly concerned. The creditors, upon the facts proved, could have maintained the levy as against Wessel; and Reed was justly entitled to have them paid out of the assigned property. Atwood's purchase at the execution sales was not sustainable, in his hands at least, for the claims should have been cancelled before judgment. As to this purchase, Wessel's claim is destitute of the slightest foundation. Not only is no evidence offered to show what he paid for the assignment of it, but the assignment itself, although dated a few days before the filing of the bill, was acknowledged after the process was served upon all the defendants.

Upon the whole case, we are entirely satisfied that all of the defendants have from the first been engaged in a combination to defraud Reed, and that the execution sales were made to accomplish that result. The decision of the court below was correct, and the decree must be affirmed with costs.

MARTIN CH. J., and MANNING J., concurred.

CHRISTIANCY J., did not sit in this case.